SHIRLEY S. ABRAHAMSON, J.
0dissent-ing).[1]
¶ 107. I would affirm the judgment of the circuit court and the decision of the court of appeals in favor of the Town of Dover.[2] The statutes challenged are presumed *107 constitutional. The challengers have not carried their heavy burden to prove the statutes unconstitutional beyond a reasonable doubt.[3]
¶ 108. The legislature has declared that if a real property owner wishes to contest the amount of an assessment at the board of review or circuit court, the property owner must, on the reasonable written request of the assessor, allow the assessor an "actual view" of the real property. See Wis. Stat. §§ 70.47(7)(aa), 70.32(1).
¶ 109. The statutory words "actual view" have been interpreted as including both an interior and exterior view of the real property.[4] The instant case *108 involves the Milewskis' refusing to allow the assessor to view the interior of their real property, a home. I therefore focus on this issue, as does the lead opinion. Other taxpayers may refuse to give an assessor a view of the exterior of the real property or both the exterior and interior. Substantially the same or similar issues may arise in these instances.[5]
¶ 110. The lead opinion asserts that the legislature has conferred on the Milewskis an unconstitutional choice of Option A or Option B:
¶ 111. If the Milewskis choose Option A, they consent to an assessor's viewing the interior of their home (thereby forgoing their Fourth Amendment right to bar the government from their home) and can contest the amount of the assessment in a hearing before the Board of Review and a court (thereby exercising their Fourteenth Amendment due process right to a hearing to contest the amount of the assessment).
¶ 112. If the Milewskis choose Option B, they refuse to allow an assessor to view the interior of their home (thereby exercising their Fourth Amendment right to bar the government from their home) and *109 cannot contest the amount of the assessment in a hearing before the Board of Review and a court (thereby forgoing their Fourteenth Amendment due process right to a hearing to contest the amount of the assessment, according to the lead opinion).
f 113. I conclude that an assessor's entry into the interior of the home is a search under the Fourth Amendment. I further conclude, as did the circuit court and court of appeals, that Wis. Stat. § 70.47(7)(aa) and § 74.37(4)(a), the challenged statutes, do not violate the Milewskis' Fourth Amendment or Fourteenth Amendment rights (or analogous state constitutional rights).
f 114. Section 70.47(7)(aa) governs proceedings before the board of review and bars a person who refuses to allow an assessor to view property from appearing or testifying before the board or contesting the amount of the assessment:
(aa) No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.
¶ 115. Section 74.37(4)(a) governs proceedings before the circuit court and bars a claim or action for an excessive assessment unless the property owner complied with the procedure for objecting to assessments prescribed in § 70.47(7)(aa):
(a) No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under s. 70.47, except under 70.47(13), have been complied with....
*110 f 116. Wisconsin is not alone in tying a challenge to the amount of a property assessment to a property owner's permitting a taxing authority to view the real property.[6]
¶ 117. Although the lead opinion describes its task as "straightforward," it engages in a lengthy, overly complex discussion. It focuses on numerous intricacies, including the special needs exception to the Fourth Amendment and the messy, ill-understood "unconstitutional conditions" doctrine.[7] It misses the big picture as well as the components of the tax assessment statutes.[8]
f 118. My analysis of the issues proceeds as follows:
f 119. Part I sets forth two realities essential to understanding the instant case: The Milewskis did not surrender their Fourth Amendment rights; the assessor never entered the home. The Milewskis retain rights under the statutes to a due process hearing in which to contest their assessment; they exercised these rights.
¶ 120. In Part II, I examine Wis. Stat. § 70.32(1) and determine that the legislative directions to assessors regarding the methods of valuation express a *111 preference for an "actual view" of the real property, meaning the view of the interior and exterior. The lead opinion rests on a fundamental misinterpretation of § 70.32(1).
¶ 121. Part III examines the legislature's reasonable, constitutional inducement to property owners to consent to an assessor's actual view of the real property by imposing a reasonable, constitutional restraint on the property owner's ability to contest the amount of an assessment. The legislative provisions advance significant, legitimate governmental objectives.
¶ 122. In Part IV, I analogize the challenged tax statutes to Wisconsin's Implied Consent Law by which the State has imposed a choice on drivers. The effect of this constitutional choice is to discourage a driver's exercise of a Fourth Amendment right to be free from intrusive government searches of the person by a blood draw.
¶ 123. In Part V, I show that the challenged tax statutes are but a specific application of the unremarkable principle that a taxpayer must make full disclosure of material information to a taxing authority or face civil tax consequences for failing to divulge the information. This principle of "make a full disclosure or lose a claim or defense" also exists in other areas of the law.
¶ 124. Part VI concludes the analysis by probing the meaning of the mandate of the lead opinion.
)—I
¶ 125. The reader should approach the instant case keeping two realities firmly in mind:
¶ 126. One. the Town's assessor did not enter the interior of the Milewskis' home. No search of the *112 Milewskis' home occurred.[9] And no search would have occurred without their express consent. The Milewskis did not surrender any constitutional right to be free from an unreasonable search.[10] See lead op., ¶¶ 6-12.
¶ 127. No assessor forced his or her way into the home, enlisted the aid of law enforcement officers to enter the home, or otherwise interfered with the Milewskis' exercise of their right to deny an assessor entry into the home. No physical occupation or entry without a warrant[11] or without consent occurred, was *113 attempted, or was even contemplated.[12]
¶ 128. Two, the Milewskis have received full due process hearings in three courts—in the circuit court, in the court of appeals, and in this court. Furthermore, the Milewskis retained and exercised rights under the statutes to a hearing in which they challenged the assessment as excessive on specified grounds.
f 129. The lead opinion misleadingly suggests that the Milewskis have been subjected to a tax and "have been forbidden any process by which to challenge it." Lead op., f 24. Three courts have addressed the Milewskis' objections to the assessment of their home and their challenge to the statutes at issue. The Milewskis went the "whole nine yards" and lost on the merits in two courts.
¶ 130. Moreover, the lead opinion misleadingly suggests that as a result of the challenged statutes, the Milewskis lose "the ability to contest their increased tax burden." Lead op., ¶¶ 24 n.9, 68. But property owners who refuse to allow an assessor an actual view of the real property may nevertheless avail themselves of procedures to challenge the legitimacy, nature, and scope of the assessment.
f 131. Indeed, the Milewskis availed themselves of their statutory right to a hearing challenging the assessment as excessive. The Milewskis brought claims against Gardiner Appraisal Service, LLC, the Town's assessor. They had a due process hearing in circuit court in which they sought damages from the *114 Town's assessor on a claim of excessive assessment and retaliation or coercion.[13] See Wis. Stat. § 70.503.[14]
¶ 132. The court of appeals affirmed the circuit court's dismissal of these retaliatory assessment claims against Gardiner Appraisal Service, holding that there was no evidence that Gardiner Appraisal Service intentionally violated the law by performing the assessment in a retaliatory manner.[15] The Milews-kis did not seek review of this dismissal in this court.
*115 ¶ 133. Property owners also have the right to a due process hearing if they claim that the request to view the interior of the real property was unreasonable. See Wis. Stat. §§ 70.05(4m), 70.47(7)(aa). The Milewskis do not assert that the assessor's written request to view their real property violated the statutory requirements.[16]
¶ 134. To be clear, the Milewskis were afforded due process of law. The Milewskis challenged in the courts the tax assessment system that led to the assessment of their real property. The Milewskis also had statutory rights to the Board of Review's determination of whether the assessment of their property was excessive and retaliatory and whether the request for an actual view of their property violated statutory requirements.
¶ 135. Two realities: No search of the Milews-kis' home occurred. The Milewskis had a hearing under the statutes, and they challenged the assessment as excessive in court proceedings.
I—I h-H
¶ 136. The task of prescribing a uniform method for valuing property for taxation purposes lies with the legislature. Since the 19th century, the legislature has directed assessors how to value real property. The present statute is Wis. Stat. § 70.32(1).
*116 ¶ 137. The lead opinion rests on a fundamental misinterpretation of Wis. Stat. § 70.32(1).
¶ 138. The lead opinion concludes that an assessment can be based either on an actual view or on the best information that the assessor can practicably obtain, and that the legislature has not expressed a preference for one method over the other. The inevitable result of this reading is that the property owner can dictate the valuation methodology by refusing to allow an assessor an actual view of the real property.
¶ 139. The lead opinion at ¶ 51 reaches this interpretation by relying solely on the text of the phrase "from actual view or from the best information that the assessor can practicably obtain" in the first sentence of Wis. Stat. § 70.32(1):
70.32 Real Estate, How Valued (1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under [Wis. Stat. §] 73.03(2a) from actual view or from the best information that the assessor can practicably obtain.... (Emphasis added.)
f 140. This narrow, either/or reading of the statute based on the text of only one phrase in a lengthy statutory provision contravenes the basic rule of statutory interpretation that a statute be interpreted in context.[17] Rather than reading this phrase in isolation, it should be read in the context of the entire section, in the context of the tax assessment statutes, in the context of prior judicial interpretation of the statute, *117 and to avoid unreasonable or absurd consequences.[18] This court has instructed that the appropriate valuation methodology is determined by looking "at the governing statutes, reviewed in conjunction with basic principles of real property assessment as described by case law, treatises, and the [Wisconsin] Property Assessment Manual."[19]
¶ 141. Section 70.32(1) of the Wisconsin Statutes provides in full as follows:
Wis. Stat. § 70.32(1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed. (Emphasis added.)
¶ 142. A reading of the full text of Wis. Stat. § 70.32(1) demonstrates that the legislature has given assessors several instructions about valuation of real property that inform the interpretation of the statute's phrase "actual view or from the best information that the assessor can practicably obtain":
*118 • The legislature has instructed assessors to value real property according to the Wisconsin Property Assessment Manual.
• The legislature has instructed assessors to value real property according to "professionally acceptable appraisal practices."
• The legislature has instructed assessors to use a hierarchy of valuations to value real property.
• As judicially interpreted, the legislature has expressed a preference for valuation on the basis of an actual view of the real property, although the legislature has recognized that valuation requires attention to other enumerated statutory factors and the judgment and expertise of the assessor.
f 143. The first statutory direction to assessors in Wis. Stat. § 70.32(1) is that real property be valued in the manner specified in the Wisconsin Property Assessment Manual. The Manual is published annually by the Department of Revenue. The legislature envisions the Manual as setting forth accepted assessment methods and reflecting advances in the science of assessment, court decisions, and other information considered valuable to local assessors. Wisconsin Stat. § 73.03(2a) provides in relevant part as follows:
The manual shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level. The manual shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information considered valuable to local assessors by the department.
| 144. Assessors must adhere to the Manual, but when an assessment is based on a directive in the *119 Manual that does not properly interpret Wisconsin law, the assessment may be erroneous as a matter of law.[20]
¶ 145. The Wisconsin Property Assessment Manual mandates that "actual view requires a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." See Wisconsin Property Assessment Manual at 10-55.[21] This interior view requirement makes sense. The assessor hired by the Town of Dover in the instant case asserts that the interior of a home constitutes about 70% of its value.[22]
¶ 146. The lead opinion maintains that there is no need for an interior inspection of the Milewski home. Lead op. ¶¶ 51-52. Wrong! There is!
¶ 147. An assessor for the Town of Dover was last in the interior of the Milewskis' residence in 2004. According to its affidavit, Gardiner Appraisal Services could not verify whether any remodeling had been performed since then. Thus, when the assessor at *120 tempted to set a valuation for the Milewskis' house without an interior inspection, he "could not accurately determine the effective physical, functional and economic obsolescence of the structure, curable or non-curable. ... A single remodel project, like a kitchen or bath, could have significantly increased the value of the home."[23]
¶ 148. A second reason a view of the interior of the Milewskis' home was especially crucial is that the Town was conducting a full revaluation of all real property in the Town's jurisdiction. A full revaluation refers to an assessment of all the real property in the Town. See Wis. Stat. §§ 70.045, 70.05(5). A full revaluation is required periodically "to meet the requirements of fair and uniform assessment." Wisconsin Property Assessment Manual at 4-1.
f 149. Accordingly, the assessor in the instant case, Gardiner Appraisal Services, performed the appraisal of the Milewskis' house while doing a full revaluation of all the real property in the Town of Dover to establish new, equitable assessments for all real properties. The written contract between the Town of Dover and Gardiner Appraisal Services required, inter alia, that "[the] assessorQ will view the exterior and interior of all structures unless denied access after mailing a request to owner by certified mail."
¶ 150. Requiring assessors to undertake an actual view of the real property in a revaluation is a valid and reasonable application of Wis. Stat. § 70.32(1), the Manual, and professional appraisal practices.
¶ 151. The second direction in Wis. Stat. § 70.32(1) to assessors regarding valuation is that the *121 assessors comply with "professionally acceptable appraisal practices." Emphasizing the importance of the phrase, the statute references "professionally acceptable appraisal practices" three times. In its last use of the phrase, Wis. Stat. § 70.32(1) explicitly states that "[i]n determining the value . . . the assessor shall consider ... all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed."
¶ 152. The Department of Revenue is directed to illustrate accepted assessment methods in the Manual. Wis. Stat. § 70.03(2a).
¶ 153. Viewing the interior of a building is surely a "professionally acceptable appraisal practice." Gar-diner Appraisal Service's brief and affidavit cite (and include excerpts from) the Appraisal Institute's[24] text Appraisal of Real Estate at 219-20 (14th ed. 2013), which Gardiner Appraisal Services describes as "a widely accepted treatise on assessment methods."[25]
*122 ¶ 154. The text states that "the importance of a site visit should not be underestimated." An appraiser's primary task during a site visit is to write a "thorough building description" that "helps the appraiser identify the extent and quality of building improvements, calculate their cost, and identify physical deterioration and functional obsolescence." The Appraisal of Real Estate at 220-21.
1 155. Further emphasizing the importance of an exterior and interior view of real property as a professionally acceptable appraisal practice, the text goes on to explain that if a site visit was not made, the appraisal report must clearly and conspicuously describe the "extraordinary assumption that the site and building characteristics are as described even though the appraiser has not confirmed that information through a site visit." The Appraisal of Real Estate at 220.
¶ 156. This expressed, explicit distrust of an appraisal conducted without an exterior and interior view strongly supports the proposition that an on-site inspection is a professionally accepted appraisal practice; valuations made without on-site inspections should be the exception and not the rule for professional appraisers.[26]
*123 f 157. An actual view of the interior and exterior of a building is, without question, a professionally acceptable appraisal technique.
¶ 158. The third legislative direction in Wis. Stat. § 70.31(1) to assessors regarding valuation of real property is that they comply with the hierarchy of valuation methodologies. Assessors are obligated to follow what is known as the Markarian three-tier hierarchy to value real property.[27] See State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 173 N.W.2d 627 (1970). The hierarchy set forth in § 70.32(1) and case law is as follows.
¶ 159. First tier: An assessor must base the assessment of the subject property on a recent arm's-length sale of the property, if available.[28] This is perhaps the only assessment methodology that does not rely on data gleaned from an actual view of the real property.
¶ 160. Of course, a recent arm's-length sale ordinarily represents a consideration by the buyer of the interior and exterior of the real property. Rational prospective homebuyers would inspect the real prop *124 erty and not simply rely on a seller's representations of the home, the record of permits pulled for the home, or the assessed value of similar properties.
¶ 161. Second Tier: If the subject property was not recently sold, an assessor must base the assessment of the subject property on sales of reasonably comparable property.
¶ 162. The sales comparison approach is "based on the premise that similar properties will sell for similar prices on the open market." Wisconsin Property Assessment Manual at 9-24. The Manual requires using the sale price of properties that are "similar to the subject property in age, condition, use, type of construction, location, design, physical features and economic characteristics." Wisconsin Property Assessment Manual at 9-24. An important consideration in determining whether properties are comparable is the improvements.[29]
¶ 163. Third Tier: If no sales of reasonably comparable properties are available, an assessor may assess the subject property using other assessment methodologies, such as cost and income.[30] In assessing *125 under this tier, an assessor may consider "all the factors collectively which have a bearing on value of the property in order to determine its fair-market value." Markarian, 45 Wis. 2d at 686. Gardiner Appraisal Services asserts that without accurate information from an interior view of the real property, it "is not possible to do an accurate cost, market, or income approach to valuation."
f 164. A final direction to assessors comes from case law interpreting Wis. Stat. § 70.32(1) and its precursors. The court has recognized that the legislature has expressed a preference for assessments based on an actual view of the real property and that the legislature has also concluded that valuation requires attention to other enumerated statutory factors and requires the judgment and expertise of the assessor.
¶ 165. In the 1860s, the precursor to Wis. Stat. § 70.32(1) referred to an "actual view" and enumerated various factors to be considered in valuation, including "all buildings" and "improvements of every description thereon."[31] The disjunctive phrase "or from the best *126 information that the assessor can practicably obtain" was later added to the statute.[32]
f 166. In considering the statute that included the disjunctive phrase, the court accepted the idea that the legislature expressed a preference for an actual view. The court did not, however, invalidate the assessment when the assessor failed to undertake an actual view. The court acknowledged that" [i]t may be that a valuation from actual view is always possible, but it is not always practicable." Boorman v. Juneau County, 76 Wis. 550, 553, 45 N.W. 675 (1890). The Boorman court surmised that the assessor was acquainted with the property from prior years.[33]
*127 ¶ 167. In sum, Wis. Stat. § 70.32(1) addresses and provides direction to assessors regarding the methodology of valuation. With its explicit reference to "actual view"; its references to the Wisconsin Property Assessment Manual, "professionally acceptable appraisal practices," and the hierarchy of assessment methodologies; and its longstanding judicial interpretation, Wis. Stat. § 70.32(1) suggests a preference for actual view in an assessment—meaning interior and exterior view—and at the same time empowers assessors to use their judgment and expertise within the parameters set forth in the statute.
¶ 168. The lead opinion's narrow, either/or reading of Wis. Stat. § 70.32(1) breaches a contextual reading and breaks with precedent. The lead opinion's allowing the property owner in effect to dictate the valuation methodology impairs the functioning of the tax assessment system.
¶ 169. Because the legislature has established a preference for an actual view in valuation of real property, the legislature has also attempted to influence a property owner to permit an assessor an actual view of the real property. Indeed, the legislature's decision to induce real property owners to permit an assessor's actual view supports the proposition that the legislature prefers that assessors have an actual view of the real property.
Ill
¶ 170. To advance the significant, legitimate governmental objective of uniformity and equity, the leg *128 islature has provided a reasonable, constitutional inducement to property owners to consent to an assessor's actual view of the real property: The legislature imposes a reasonable, constitutional limit on the ability of a property owner to contest the amount of an assessment if the property owner prevents the assessor from having an actual view of the real property.
¶ 171. I turn to the state constitutional requirement of uniformity. The Uniformity Clause of the Wisconsin Constitution dates back to the 1848 Constitution. It provides in relevant part that "[t]he rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods. ..." Wis. Const. art. VIII, § 1. See lead op., ¶ 3.
¶ 172. The Uniformity Clause requires that taxes be fairly allocated among taxpayers. Comparable properties in the district are to be assessed uniformly.[34] "The purpose of the Uniformity Clause is to ensure the tax burden is allocated proportionally to the value of each person's property." Lead op., ¶ 47.
¶ 173. The Uniformity Clause requires the same measuring stick to be applied to comparable properties. "Satisfying the Uniformity Clause requires ... a uniform method of determining the value of [] property . . . . " Lead op., ¶ 48.
f 174. The valuation of real property depends to a large extent on the condition and quality of both the exterior and interior of the real property. Thus, the requirement of an actual view strongly relates to the state constitutional requirement of uniformity.
*129 ¶ 175. Inaccuracy in the assessment of a parcel of real property may result in inaccurate, and potentially unjust, tax assessments of other real properties in that taxing jurisdiction. See lead op., ¶¶ 47-48; Noah's Ark Family Park v. Bd. of Review, 210 Wis. 2d 301, 310-12, 565 N.W.2d 230 (Ct. App. 1997) (Ct. App. op. adopted as op. of the Wisconsin Supreme Court, 216 Wis. 2d 387, 390, 394, 573 N.W.2d 852 (1998)).
¶ 176. The lead opinion asserts that the Town "contradict[s] itself' by arguing that the Uniformity Clause requires an "actual view" and then nevertheless proceeds to assess the Milewski real property using other assessment methodologies. Lead op., ¶ 51. The lead opinion concludes that "[i]f proceeding under this alternative was not consistent with the Uniformity Clause, then the Town indicts itself for violating the constitution . . . ." Lead op., ¶ 51.
¶ 177. The lead opinion stumbles. The Town's argument is not contradictory: Once the Town proceeded to assess real property using an "actual view," it applied the same methodology throughout the Town complying with the Uniformity Clause and the revaluation process. The Milewskis prevented the use of the same methodology for their property. When the Milewskis refused to allow the assessor an actual view of the real property, they prevented the Town from complying with the mandate under the Uniformity Clause to apply a uniform method of valuation. They prevented the Town from treating similarly situated property owners similarly. The Town had no choice but to use a different method for valuing the Milewskis' real property.
¶ 178. The Town must nevertheless assess the Milewskis' property. The Milewskis cannot escape assessment and taxation by refusing to allow the assessor *130 to view the interior of the real property. To assess the Milewskis' real property, the Town was forced to use the "best information that the assessor [could] practicably obtain" in accordance with Wis. Stat. § 70.32(1).
¶ 179. To achieve even-handedness among real property owners when a property owner refuses to allow an assessor an actual view of the real property, the legislature imposes reasonable, constitutional restrictions on the ability of property owners to contest the amount of an assessment. The Town of Dover describes achieving this goal of even-handedness among real property owners in terms of avoiding the "free-rider" as follows:
If most homeowners allow the assessor into their homes to get an accurate assessment, but some homeowners are allowed to force the assessor to make his or her assessment without that crucial information and are still allowed to try to decrease their assessment by challenging it in other respects, the probable consequence is that wealthy homeowners will be able to avoid paying their fair share of taxes by hiding their interior improvements.[35]
¶ 180. Unless the assessor has access to the interior of the real property, the taxing entity is at a significant disadvantage in justifying its assessment when challenged by the property owner.
f 181. When a property owner challenges an assessment, there is a rebuttable presumption that the assessment is correct.[36] If the property owner shows *131 that the assessor has not adhered to the statutes or the property owner presents significant contrary evidence that establishes it is more probable than not that the assessed value is not correct, the presumption ceases to apply.[37]
¶ 182. In the instant situation, the property owners (and their expert) know the interior of the real property but the Town (and its expert) do not. If the Town does not have evidence regarding the interior of the real property, the Town cannot rebut the property owners' evidence. To avoid this situation, the legislature has restricted the property owner's ability to contest the amount of the assessment if the property owner refuses the assessor an actual view.
¶ 183. According to the lead opinion, a property owner can, without any adverse consequences, refuse an assessor an actual view of the real property and apparently can still contest the amount of the assessment. The result is two-fold: (1) The property owner and the Town (which represents all property owners) are not on an equal, fair, level "playing field" in debating the amount of the assessment; and (2) the decision maker will not have the full information that the assessor could provide (if he or she had an actual view) upon which to determine the amount of the assessment. As the court of appeals concluded, "[t]he interior view of the home is one of the most important pieces of evidence that the tax assessor must consider when making an assessment. No other means are as effective to provide an accurate valuation." Milewski v. *132 Town of Dover, No. 2015AP1523, unpublished slip op., ¶ 19 (Wis. Ct. App. May 4, 2016).
¶ 184. An assessment decision resting on only one side's (the property owner's) presentation of evidence relating to the interior of the property is very apt to be erroneous. The law recognizes the importance of a decision's being based on full and complete information.[38] Restricting the ability of a property owner who refuses the assessor an actual view to contest the amount of the assessment is thus necessary to assure that both the property owner and the taxing entity have equal access to material information and that the decision maker has this information to enable it to establish a just and equitable assessment.
¶ 185. The lead opinion asserts that the Milewskis may suffer adverse consequences, "substantial impediments," and "evidentiary consequences" as a result of refusing the assessor an actual view, but the lead opinion does not reveal them; they are kept a secret, not to be divulged by the lead opinion. See lead op., ¶ 26 n.ll. See also my discussion in Part VI of this dissent, asserting that the meaning of the mandate is clandestine.
¶ 186. Of course, the legislature could have chosen a different path to restrict the non-consenting property owner's rights to contest the amount of an assessment. For example, the legislature could have permitted the non-consenting property owner to appear before the board to contest the amount of the *133 assessment but could have barred him or her from submitting any evidence relating to the interior of the real property.
¶ 187. Without such evidence, in all likelihood, the non-consenting property owner's challenge to the amount of the assessment would be dismissed. The result would be the same as the legislature's simply barring from the outset the non-consenting property owner from contesting the amount of the assessment. The legislature's decision to bar a non-consenting property owner from contesting the amount of the assessment is different in form, but not in substance, from barring a non-consenting property owner from introducing evidence. The legislature has made a sound, constitutional policy choice that this court should not overturn.
f 188. In sum, an interior (and exterior) view of real property (an actual view) is germane to, and has an extremely powerful nexus with, valuation and assessment. The legislature has a strong interest in inducing real property owners to consent to an assessor's actual view of the real property and to treat property owners who do consent differently in contesting the amount of an assessment from property owners who do not consent. The challenged statutes compellingly relate to the governmental interest of uniform taxation and fairness to all property owners.
f 189. With the robust government interest in uniformity and fairness in mind, I examine the Fourth and Fourteenth Amendments.
¶ 190. To recap, according to the lead opinion, the statutes force an unconstitutional choice on property owners: On the one hand, consent to an assessor's viewing the interior of a home (relinquishing a protected Fourth Amendment right) and retain the right *134 to a hearing in which to contest the amount of the assessment (a procedural due process right), and on the other hand, refuse to consent to an assessor's viewing the interior of a home (maintaining a protected Fourth Amendment right) and relinquish the right to a hearing in which to contest the amount of the assessment (relinquishing a procedural due process right). I disagree with this portrayal of a constitutional dilemma.
¶ 191. As noted above, there was no search, and the Milewskis have had due process hearings in which they have asserted their challenge to the assessment and the statutes.
¶ 192. Moreover, the touchstone of the Fourth Amendment is reasonableness. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Not all searches violate the Fourth Amendment, only unreasonable ones. The determination of whether a particular search is reasonable must be made by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Delaware v. Prouse, 440 U.S. 648, 654 (1979).[39]
¶ 193. Recently, the United States Supreme Court explained the reasonableness standard in Fourth Amendment jurisprudence and the balancing of the intrusion and the governmental interests as follows:
Borrowing from our Fifth Amendment jurisprudence, the United States suggests that motorists could be deemed to have consented to only those conditions [a *135 blood draw] that are "reasonable" in that they have a "nexus" to the privilege of driving and entail penalties that are proportional to severity of the violation. Brief for United States as Amicus Curiae 21-27. But in the Fourth Amendment setting, this standard does not differ in substance from the one that we apply, since reasonableness is always the touchstone of Fourth Amendment analysis, see Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). And applying this standard, we conclude that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense.
Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016).
f 194. The challenged statutes do not require a property owner to relinquish a Fourth Amendment right by permitting an assessor's entry into the home.
¶ 195. Rather, the statutes offer the property owner an incentive, an inducement, to consent to an assessor's entry into the home. An entry in the home is an intrusion. But the level of intrusion for tax assessment purposes is less of an intrusion on personal privacy and dignity than other searches.
¶ 196. A tax assessor would not be rummaging through a real property owner's personal effects, file cabinets, computers, closets, medical cabinets, drawers, locked cabinets or other private materials not germane to valuing the physical attributes of the real property. Moreover, the amount of time taken by an assessor to view the home is ordinarily much shorter than the time taken in a search conducted in the course of a criminal investigation.[40] In an assessment *136 search, the property owner is not singled out as the object of official suspicion. Nothing is seized. The property owner is given advance notice and the entry is at a convenient time for the property owner. The property owner may remove or conceal any personal effects before the assessor arrives.
f 197. The legislature's inducement to obtain the property owner's consent to the assessor's entry is to require the non-consenting property owner to forgo a hearing at which the owner may contest the amount of the assessment. The inducement is more than reasonable in light of the governmental interests involved.
¶ 198. In examining the procedural due process issue the lead opinion raises, I note that the touchstone of procedural due process is that due process is "flexible and requires only such procedural protections as the particular situation demands."[41] "Since the time of [its] early explanations of due process," the United States Supreme Court has "understood the core of the concept to be protection against arbitrary action."[42] The challenged statutes are not arbitrary; they are reasonable and germane to significant governmental interests.
*137 ¶ 199. As discussed above, the parties will not be on an equal footing at a hearing to determine the assessment if the Town will not have information about the interior of the real property to defend its assessment. The decision maker will not have the benefit of full information upon which to establish an assessment. The non-consenting property owner may thus be able to distort its assessment to the detriment of the other property owners and to impinge on the Town's ability to comply with the Uniformity Clause.
¶ 200. The legislative restriction upon the Milewskis' right to contest the amount of the assessment is more than reasonable under the circumstances. The statutes do not impose an arbitrary restriction on the property owner and do not violate due process. Considering the countervailing governmental interest in uniform taxation, the challenged statutes do not constitute government action arbitrarily limiting the Milewskis' due process rights.
f 201. In sum, bearing in mind the interests of the real property owner and the public, I conclude that the options the legislature offered to the Milewskis do not impair, to an appreciable extent, the rights involved and do promote, to an appreciable extent, weighty governmental interests.
<!
¶ 202. I conclude that the options the legislature offers the property owner are constitutionally sound government-imposed "tough" choices. I analogize the challenged statutes to Wisconsin's Implied Consent Law, Wis. Stat. § 343.305.
*138 ¶ 203. Tough choices, even choices that discourage the exercise of a Fourth Amendment right, are common in the law and are viewed as voluntary and constitutionally valid:
The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.[43]
The lead opinion apparently refuses to accept that such a choice is valid. See, e.g., lead op., ¶ 68 n.29.
f 204. In Wisconsin's Implied Consent Law, the State imposes a choice on drivers. The choice has the effect of discouraging the exercise of a Fourth Amendment right to be free from a government search of a person's body. The Wisconsin Implied Consent Law is constitutional .[44]
*139 ¶ 205. Under the Wisconsin Implied Consent Law, a driver faces the "difficult choice" between consenting to a blood draw or refusing to consent to a blood draw and facing revocation of the driver's license and the prosecution's use of "refusal evidence" at trial.[45] See State v. Padley, 2014 WI App 65, ¶ 27, 354 Wis. 2d 545, 849 N.W.2d 867.[46] A blood draw is a search *140 under the Fourth Amendment. It is "an invasion of bodily integrity" and "implicates an individual's most personal and deep-rooted expectations of privacy." Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (internal quotation marks and quoted source omitted).
¶ 206. The Wisconsin property tax assessment system is, in many ways, strikingly similar to Wisconsin's Implied Consent Law. An entry into a home, like a blood draw, implicates significant privacy concerns; both are intrusions restricted by the Fourth Amendment. Both the tax assessment system and the Implied Consent Law impose civil consequences, not criminal consequences, if the individual exercises his or her Fourth Amendment constitutional right to refuse to consent to the search.[47]
f 207. And although the Fourth Amendment right to refuse a blood draw or a home entry can be exercised, the exercise comes with civil statutory consequences. The civil consequences are supported by *141 strong governmental interests. Implied consent laws serve the paramount governmental interest of enforcing drunk-driving laws and, thus, protecting public safety.[48] The tax assessment system serves the paramount government interest of raising funds and ensuring uniform and fair taxation.
f 208. Considering the apt analogy between Wisconsin's Implied Consent Law and the Wisconsin tax assessment system, I agree with the court of appeals' reasoning in the instant case upholding the constitutionality of the statutory choice imposed on the Milews-kis:
Here, Plaintiffs have the "right" to refuse to allow Gardiner access to their home, but the consequence that flows from the refusal is cessation of the right to challenge the tax assessment and pay without recourse. There is no due process violation; the choice belongs entirely to Plaintiffs.[49]
V
¶ 209. Another way of depicting the unexceptional aspects of the challenged tax assessment statutes is to analogize them to the unremarkable principle of tax law that a taxpayer must make full disclosure to a taxing authority or face civil tax consequences for failing to divulge information to the taxing authority. The consequence for refusing an assessor's reasonable request for an interior view is not retaliatory or punitive. Rather it is a legal, logical extension *142 of the usual rule that a taxpayer who has material information about his or her tax matters must divulge it to the taxing authority.
¶ 210. The United States Supreme Court explained this principle in Wyman v. James, 400 U.S. 309, 404 (1971). In Wyman, the Court explained that disallowing a deduction (which increased the tax, a taking of property according to the lead opinion) was a valid consequence for the taxpayer's refusal to submit proof substantiating the claimed deduction:
[In a federal income tax dispute between a taxpayer and an IRS agent] an Internal Revenue Service agent, in making a routine civil audit of a taxpayer's income tax return, asks that the taxpayer produce for the agent's review some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax. If the taxpayer refuses, there is, absent fraud, only a disallowance of the claimed deduction and a consequent additional tax. The taxpayer is fully within his "rights" in refusing to produce the proof, but in maintaining and asserting those rights a tax detriment results and it is a detriment of the taxpayer's own making.... [N]oth-ing of constitutional magnitude is involved.
Wyman, 400 U.S. at 389.
¶ 211. Similarly, this court has confirmed that "the privilege of appearing before the board of review and having assessment errors corrected is coupled with a duty of the taxpayer to make full disclosure of information." Hermann v. Town of Delavan, 215 Wis. 2d 370, 393, 572 N.W.2d 855 (1998) (citing Wis. Stat. § 70.47(7)(a)).[50]
*143 f 212. Wisconsin Stat. § 70.47(7)(a) explicitly disallows a person "to question [in any action or proceeding] the amount or valuation of property unless . . . [the person] made full disclosure before said board, under oath of all that person's property liable to assessment. . . and the value thereof." Similarly, Wis. Stat. § 70.47(7)(af) states that no person may object to a valuation if that valuation was made by the assessor using the income method unless the person supplies to the assessor all of the information about income and expenses that the assessor requests.[51]
¶ 213. At the turn of the last century, Wisconsin Supreme Court Justice Joshua Eric Dodge eloquently explained the rationale behind the principle that the taxpayer who has information must disgorge the information (to which the taxing authority does not have access) in order to challenge the assessment, to ensure *144 that the property owner and the taxing entity have a "level playing field" before the decision maker so that the decision maker can allocate the burden of taxation fairly:
[The taxing authority] and the public are entitled that [the taxing authority] shall not be successfully attacked in court without full and frank disclosure from the taxpayer of the superior knowledge which he necessarily has upon the subject. It is perhaps utopian to expect of human selfishness voluntary original information . . ., but when one presents himself to give evidence against the amount which the assessor has fixed in the light, or obscurity, which necessarily surrounds him, it is but right that the taxpayer furnish all the enlightenment in his power without evasion or concealment.. . .
State ex rel. Foster v. Williams, 123 Wis. 73, 76-77, 100 N.W. 1052, 1053 (1904).
¶ 214. By refusing to permit the assessor an interior view of the real property, the property owner fails to make a full disclosure to the taxing entity. Because the property owner fails to make full disclosure, the owner is restricted from contesting the amount of the assessment. By holding the challenged statutes unconstitutional as applied, the lead opinion essentially eviscerates the longstanding full disclosure rule, to the detriment of uniformity and fairness.[52]
¶ 215. In the instant case, the legislature has given notice to property owners that it deems an assessor's actual view of real property material evi *145 dence and that the property owners' failure to produce this material evidence will result in restricting the property owners' right to contest the amount of the assessment. By failing to permit an interior view of the real property, property owners cannot at the same time take advantage of the law's protection of the information and use the information to seek an advantage against an opposing person (including a government entity) that does not otherwise have access to the information.
¶ 216. The full disclosure rule exists outside of tax law. For example, if a plaintiff claiming damages for personal injury refuses to disclose his or her otherwise confidential medical records, the plaintiffs claim will be dismissed.[53]
*146 See Wis. Stat. § 804.10, 905.04(4)(c).[54]
¶ 217. The challenged statutes are, in a sense, a corollary of the well-accepted legal principle that persons who fail to disclose material evidence that is in their possession and that is not readily available to an opposing party may not avail themselves of a judicial forum.
VI
f 218. I conclude by probing the meaning of the mandate of the lead opinion.
¶ 219. The lead opinion remands the matter to the circuit court "for further proceedings consistent with this opinion." Nowhere does the lead opinion discuss the further proceedings; it is not clear what the lead opinion has in mind. See lead op., ¶ 26 ("We express no opinion on whether the Milewskis will be able to carry their burden of proof upon the contest of the Property's value, but that has nothing to do with whether they have the right to hazard the attempt.").
¶ 220. Does the circuit court determine the assessment? Does the circuit court remand the matter to *147 the Town Board of Review to determine the assessment? May the Milewskis hire an appraiser at their own expense to view the interior of their home and submit that appraiser's opinion to the board of review or circuit court?
¶ 221. The Milewskis' brief provides no help in advising what happens should they prevail in this court. The brief seeks merely a declaration that Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) together violate their constitutional rights and this court's reversal of the decision of the court of appeals.
¶ 222. The assessor's brief concludes that, should the Milewskis prevail in this court, their remedy should be a remand of the matter to the Town Board of Review to determine the assessment. The assessor proposes this remedy because the Milewskis' challenge to the amount of the assessment was not heard by the Board and the statutory procedures require the matter be heard first by the Board. Citing Hermann v. Town of Delavan, 215 Wis. 2d 370, 381-83, 572 N.W.2d 855 (1998), the assessor argues that Chapters 70 and 74 are intended to be the exclusive means by which the property owner may contest the amount of the assessment.
f 223. Along the same lines, the Town urges that, should it lose, "the remedy should be an opportunity to challenge the assessment before the" board of review. But the Town adds that the Milewskis should not have the opportunity to "use any information that they have withheld, i.e., regarding the interior of the home."
¶ 224. Whether the circuit court or the Board of Review determines the assessment, I agree with the Town and the assessors that neither the Milewskis nor any of their witnesses should be able to use any information that they have regarding the interior of *148 the real property. Their challenge to the assessment should be limited to the assessor's calculation of the value of the real property. Without this limit on the Milewskis' challenge to the assessment of their property, the Town's duty to assess real property uniformly and fairly may become a nullity.
f 225. For the reasons set forth, I write separately in dissent.
¶ 226. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

 Five justices agree with the mandate set forth in Justice Daniel Kelly's opinion (which appears as the first opinion in the instant case). The mandate is that the decision of the court of appeals is reversed and the cause is remanded. Only Justice Rebecca G. Bradley joins Justice Kelly's opinion. Chief Justice Patience D. Roggensack joins Justice Kelly's mandate, writing separately in concurrence. Justice Annette K. Ziegler (joined by Justice Michael J. Gableman) joins Justice Kelly's mandate, writing separately in concurrence. Justice Ann Walsh Bradley joins this dissent.
Justice Kelly's opinion is referred to as a lead opinion because four justices do not agree with or join its reasoning.
As Justice Ann Walsh Bradley recently explained in State v. Weber, 2016 WI 96, ¶ 83 n.1, 372 Wis. 2d 202, 887 N.W.2d 554 (Ann Walsh Bradley, J., dissenting), although "the term 'lead' opinion ... is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said 'that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices.'" (quoting State v. Lynch, 2016 WI 66, ¶ 143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part and dissenting in part) (citing Hoffer Props., LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533)).

 The parties disagree whether the Milewskis made a facial or an as-applied challenge to the constitutionality of the statutes. The lead opinion agrees with the Milewskis that their challenge is an as-applied challenge. Lead op., ¶¶ 69-71.1 am not persuaded. I caution, as the United States Supreme Court has cautioned, that "the distinction between facial and as- *107 applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010).

 The Milewskis bear a heavy burden. See Tammy W.-G. v. Jacob T., 2011 WI 30, ¶ 46, 333 Wis. 2d 273, 299, 797 N.W.2d 854 ("In a facial challenge, the challenger must persuade us that the 'heavy burden[1] to overcome the presumption of constitutionality has been met, and that there is proof beyond a reasonable doubt that the statute is unconstitutional"); Clear Channel Outdoor, Inc. v. City of Milwaukee, 2017 WI App 15, ¶ 33, 374 Wis. 2d 348, 893 N.W.2d 24 (noting "the heavy burden challengers face on an as-applied equal protection claim and the strong presumption in favor of a taxing decision of government").

 The Wisconsin Property Assessment Manual interprets "actual view" of property to include an "interior view." See Wisconsin Property Assessment Manual at 4-3, 10-55, 21-18 to 21-20 (2017).
All subsequent references to the Manual are to the 2017 version. For a discussion of the Manual, see ¶¶ 143-145, infra.
At least as early as the 1860s the legislature has required assessors to value real property upon actual view. Marsh v. Bd. of Supervisors, 42 Wis. 502, 514 (1877). The Marsh court *108 concluded that the requirement of an actual view and the statutory enumerated factors the assessor must consider help ensure "an equal and faithful assessment of all property subject to taxation."

 Chief Justice Patience Roggensack's concurrence offers an unexpected and surprising interpretation of the phrases "actual view" and "view such property" in Wis. Stat. §§ 70.32(1) and 70.47(7)(aa), respectively. The concurrence contends that these phrases do not refer to an interior view of the real property. This interpretation (not proffered by the parties) does not resolve the issue of the constitutionality of the statutes at issue when the property owner does not allow an assessor a view of the exterior of the real property, which is curtilage. See Oliver v. United States, 466 U.S. 170 (1984); State v. Dumstrey, 2016 WI 3, 366 Wis. 2d 64, 873 N.W.2d 502.

 See, e.g., Minn. Stat. §§ 273.20, 274.01(b) (2016); Mass. Gen. Laws, ch. 58A, § 8A (2016).

 Justice Annette Ziegler's concurrence appropriately outlines some difficulties with the "unconstitutional conditions" doctrine, but much more can be said about the unworkability of the doctrine and the flaws in the lead opinion's discussion of this doctrine.

 "[T]he tax appeal administrative procedures of chs. 70 and 74 of the Wisconsin statutes are a highly evolved and carefully interwoven set of statutes providing a comprehensive remedy for individuals seeking redress for excessive assessments." Hermann v. Town of Delavan, 215 Wis. 2d 370, 394, 572 N.W.2d 855 (1998).

 The circuit court observed that no search occurred:
Circuit Court: [Milewski] here very nicely says: You can come —you can come in the yard, you can look around, but you can't go in. They don't go in, do they?
Milewski's Attorney: No, they do not.
Circuit Court: So there's no Fourth Amendment violation at all.
Milewski's Attorney: There's no search.

 Wisconsin Stat. § 70.05(4m) limits the availability and scope of an assessor's entry to view a property:
A taxation district assessor may not enter upon a person's real property for purposes of conducting an assessment under this chapter more than once in each year, except that an assessor may enter upon a person's real property for purposes of conducting an assessment under this chapter more often if the property owner consents. Aproperty owner may deny entry to an assessor if the owner has given prior notice to the assessor that the assessor may not enter the property without the property owner's permission.
Any request to view the interior of the property must be reasonable, made in writing, and delivered by certified mail. Wis. Stat. § 70.47(7)(aa).

 Wisconsin Stat. § 66.0119 provides for "special inspection warrants" for many purposes, including "property assessment."
In Camara v. Mun. Court, 387 U.S. 523 (1967), the Court required a municipal health inspector to obtain a warrant to conduct routine interior inspections for evidence of building code violations.

 Compare G.M. Leasing Corp. v. United States, 429 U.S. 338, 358 (1977) (concluding that the government's nonconsen-sual search of a business office and seizure of furnishings, books, and records contained therein was unreasonable and in violation of the Fourth Amendment absent a warrant or exigent circumstances).

 The Wisconsin statutes include protection against intentional (retaliatory) assessments. Should an assessor attempt to punish a property owner by imposing a punitive assessment, the assessor risks not only a fine but liability for the amount of the excess tax imposed on the property owner.

 Wisconsin Stat. § 70.503 provides for civil liability of an assessor as follows:
Civil liability of assessor or member of board of review. If any assessor, or person appointed or designated under s. 70.055 or 70.75, or any member of the board of review of any assessment district is guilty of any violation or omission of duty as specified in ss. 70.501 and 70.502, such persons shall be liable in damages to any person who may sustain loss or injury thereby, to the amount of such loss or injury; and any person sustaining such loss or injury shall be entitled to all the remedies given by law in actions for damages for tortious or wrongful acts. . . .
Wisconsin Stat. § 70.501 provides for an assessor's forfeiture to the state:
Fraudulent valuations by assessor. Any assessor, or person appointed or designated under s. 70.055 or 70.75, who intentionally fixes the value of any property assessed by that person at less or more than the true value thereof prescribed by law for the valuation of the same, or intentionally omits from assessment any property liable to taxation in the assessment district, or otherwise intentionally violates or fails to perform any duty imposed upon that person by law relating to the assessment of property for taxation, shall forfeit to the state not less than $50 nor more than $250.

 See Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶¶ 22-25 (Wis. Ct. App. May 4, 2016).

 Any request to view the property must be reasonable, made in writing, and delivered by certified mail. Wis. Stat. § 70.47(7)(aa). The Milewskis do not assert that they were unable to permit a view at the suggested time. Indeed, had this been their reason for refusing the assessor a view of the interior of the home, the Milewskis would have been given a chance to reconsider their refusal, even after seeing the proposed assessment. See Wisconsin Property Assessment Manual at 21—16.

 See Wis. Carry v. City of Madison, 2017 WI 19, ¶ 20, 373 Wis. 2d 543, 892 N.W.2d 233 ("We examine the statute's contextualized words, put them into operation, and observe the results to ensure we do not arrive at an unreasonable or absurd conclusion.").

 See, e.g., Berkos v. Shipwreck Bay Condo. Ass'n, 2008 WI App 122, ¶ 8, 313 Wis. 2d 609, 758 N.W.2d 215 ("Also relevant to a statute's plain meaning is prior case law interpreting the statute.")

 Walgreen Co. v. City of Madison, 2008 WI 80, ¶ 19, 311 Wis. 2d 158, 752 N.W.2d 687.

 Metro. Holding Co. v. Bd. of Review, 173 Wis. 2d 626, 632, 495 N.W.2d 314 (1993).

 That an actual view requires an assessor to view the interior of real property is an observation echoed throughout the Wisconsin Property Assessment Manual. For example, at 6-12, the Manual explains that "data collected on each property should be complete, accurate, and consistent," requiring, inter alia, that the assessor "[v]iew the interior of the building, recording physical data." The Manual explains further that "[p]hysical characteristics such as age, condition, design, layout, quality of construction materials, and workmanship all have an effect on the value of improvements." Wisconsin Property Assessment Manual at 9-20. These characteristics necessarily depend on an interior view.

 Gardiner Appraisal Service is a party in the instant case and filed a brief.

 Defendant-Respondent, Gardiner Appraisal Service, LLC's, Response Br. at 8.

 The Appraisal Institute describes itself as "the world's leading organization of professional real estate appraisers," and "has led the way in fostering and promoting the highest standards of [appraisal] practice through its designation programs, peer review process, education, research and publishing endeavors." See http://www.appraisalinstitute.org/about/.

 This text has been cited in numerous Wisconsin cases in which an appraisal or appraisal technique has been at issue. See, e.g., Walgreen Co. v. City of Madison, 2008 WI 80, ¶ 3, 311 Wis. 2d 158, 164-65, 752 N.W.2d 687, 690 ("This holding is consistent with the nationally recognized principle that '[a] lease never increases the market value of real property rights to the fee simple estate.' Appraisal Institute, The Appraisal of Real Estate 473 (12th ed. 2001)."); ABKA Ltd. P'ship v. Bd. of Rev. of Vill. of Fontana-on-Geneva Lake, 231 Wis. 2d 328, 354, 603 N.W.2d 217 (1999) (Wilcox, J., dissenting) (citing The Appraisal Institute, The Appraisal of Real Estate 478 (11th ed. 1996)); Vivid, Inc. v. Fiedler, 219 Wis. 2d 764, 781, 580 N.W.2d *122 644 (1998) (citing The Appraisal Institute, The Appraisal of Outdoor Advertising Signs (1994)). See also Adams Outdoor Advert, Ltd. v. City of Madison, 2006 WI 104, ¶ 114 n.29, 294 Wis. 2d 441, 717 N.W.2d 803 (Abrahamson, C.J., dissenting) (citing Ron L. Nation & Donald R Oehlrich, The Valuation of Billboard Structures, The Appraisal Journal, Oct. 1999, at 242 (publication of the Appraisal Institute).
Reference was also made to another Appraisal Institute publication titled Summary Appraisal Report: Residential (2013) for similar statements.

 Fannie Mae, to which the Gardiner Appraisal Services affidavit refers, also requires the inspection of the interior and *123 exterior of a building for an appraisal. See Fannie Mae, "Appraisal and Property Report Policies and Forms Frequently Asked Questions (FAQs)" at 4.

 " 'An assessor has an obligation to follow the three tier assessment analysis.'" Regency West Apartments LLC v. City of Racine, 2016 WI 99, ¶ 26, 372 Wis. 2d 282, 888 N.W.2d 611 (quoting Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶ 47, 294 Wis. 2d 441, 717 N.W.2d 803). See also Wisconsin Property Assessment Manual at ch. 9.

 See Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶ 34,294 Wis. 2d 441, 717 N.W.2d 803 ("Evidence of an arms-length sale of the subject property is the best evidence of true cash value.") (citing State ex rel. Keane v. Bd. of Review, 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980)).

 Rosen v. City of Milwaukee, 72 Wis. 2d 653, 686, 242 N.W.2d 681 (1976) ("Important considerations in determining whether particular property is sufficiently similar to the property being assessed to warrant reliance on its sale price as evidence of market value include its location, including the distance from the assessed property, its business or residential advantages or disadvantages, its improvements, size and use.").

 See, e.g., Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, I 34, 294 Wis. 2d 441, 717 N.W.2d 803 ("Only if there has been no arms-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.") (citing State ex rel. Keane v. Bd. of Review , 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980)); Great Lakes Quick Lube, LP v. City of *125 Milwaukee, 2011 WI App 7, ¶¶ 17-18, 331 Wis. 2d 137, 794 N.W.2d 510 (citing Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶ 11, 317 Wis. 2d 228, 767 N.W.2d 567).

 See Wis. Stat. ch. 18, § 31 (1871) (cited in March v. Board of Supervisors, 42 Wis. 502 (1877)). This statute states that real property shall be valued by the assessor from actual view and does not mention an alternative "best information" but enumerates factors to be considered. It provides as follows:
§ 31. Real property shall be valued by the assessor from actual view at the full value which could ordinarily be obtained therefor at private sale, and which the assessor shall believe the owner, if he desires to sell, would accept in full payment. In determining the value the assessors shall consider as to each piece, its advantage or disadvantage of location, quality of soil, quantity and quality of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, *126 and all buildings, fixed machinery and improvements of every description thereon, and their value. Real property held under lease from any religious, scientific, literary or benevolent association, but otherwise exempt, shall be assessed to the lessee. The assessor having fixed the value shall enter the same opposite the proper tract in the assessment roll. Property omitted from assessment the previous year by mistake, shall be entered twice, designating one entry as omitted for the year 18—. (Emphasis added.)

 See Wis. Stat. ch. 48, § 1052 (1889), which provides as follows:
Real property shall be valued by the assessor either from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value. Real property held under lease from any religious, scientific, literary or benevolent association, but otherwise exempt, shall be assessed to the lessee. The assessor, having fixed the value, shall enter the same opposite the proper tract or lot in the assessment roll. (Emphasis added.)

 More recently, the court of appeals concluded that an actual view was not required to conduct a comparable sales analysis because the village assessor had been familiar with *127 the subject properties for 14 years. State ex rel. Kesselman v. Bd. of Review, 133 Wis. 2d 122, 133, 394 N.W.2d 745 (Ct. App. 1986). In Kesselman, "[t]he circuit court found that the assessor failed to use the 'best information' available ... because he used only a drive-by inspection ...." Kesselman, 133 Wis. 2d at 126-27.

 Clear Channel Outdoor, Inc. v. City of Milwaukee, 374 Wis. 2d 348, ¶ 37, 374 Wis. 2d 348, 893 N.W.2d 24 (quoting U.S. Oil Co., Inc. v. City of Milwaukee, 2011 WI App 4, ¶ 25, 331 Wis. 2d 407, 794 N.W.2d 904 (2010)).

 Brief of Defendant-Respondent Town of Dover and Board of Review for the Town of Dover at 17.

 Walgreen Co. v. City of Madison, 2008 WI 80, f 17, 311 Wis. 2d 158, 752 N.W.2d 687; Adams Outdoor Advertising, Ltd. v. City of Madison, 2006 WI 104, ¶ 26, 294 Wis. 2d 441, 717 N.W.2d 803.

 Wis. Stat. § 70.47(13); Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶ 9, 351 Wis. 2d 439, 839 N.W.2d 893 (citing Wis. Stat. § 903.01 for the proposition that an evidentiary presumption shifts the burden to the challenger).

 See, e.g., Elias v. State, 93 Wis. 2d 278, 285, 286 N.W.2d 559 (1980) ("The responsibility of the sentencing court is to acquire full knowledge of the character and behavior pattern of the convicted defendant before imposing [the] sentence.").

 Ohio v. Robinette, 519 U.S. 33, 39 (1996) ("Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances."); State v. Gaulrapp, 207 Wis. 2d 600, 607, 558 N.W.2d 696 (Ct. App. 1996) ("[T]he Fourth Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances.").

 "[T]he purpose for the [governmental] interference bears upon the intrusiveness of government action. A criminal investigation is generally more intrusive than an administrative or *136 regulatory investigation.. . ." Widgren v. Maple Grove Twp., 429 F.3d 575, 584 (6th Cir. 2005) (citing 5 Wayne R. LaFave et al., Search and Seizure: A Treatise on the Fourth Amendment § 10.1(b) (4th ed. 2004)).

 State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 512, 261 N.W.2d 434, 444 (1978) ("[D]ue process is satisfied if the statutory procedures provide an opportunity to be heard in court at a meaningful time and in a meaningful manner. ... Due process is flexible and requires only such procedural protections as the particular situation demands.") (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).

 Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998); accord Wolff v. McDonnell, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

 McGautha v. California, 402 U.S. 183, 213 (1971), reh'g granted, judgment vacated sub nom. Crampton v. Ohio, 408 U.S. 941 (1972) (internal quotation marks and citations omitted) ("The contention is that where guilt and punishment are to be determined by a jury at a single trial the desire to address the jury on punishment unduly encourages waiver of the defendant's privilege to remain silent on the issue of guilt, or, to put the matter another way, that the single-verdict procedure unlawfully compels the defendant to become a witness against himself on the issue of guilt by the threat of sentencing him to death without having heard from him.").

 See Missouri v. McNeely, 133 S. Ct. 1552, 1566 (2013) ("States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense."); Birchfield, 136 S. Ct. at 2185 ("Our prior opinions have *139 referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply . . . and nothing we say here should be read to cast doubt on them.").

 The use of refusal evidence at trial has been held not to violate due process. North Dakota v. Neville, 459 U.S. 553 (1983); State v. Albright, 98 Wis. 2d 663, 298 N.W.2d 196 (Ct. App. 1980); State v. Crandall, 133 Wis. 2d 251, 394 N.W.2d 905 (1986).

 Although the Implied Consent Law seeks waiver of a Fourth Amendment right in exchange for retaining the "privilege of an operator's license," and, according to the lead opinion, the tax assessment system seeks waiver of a Fourth Amendment right in exchange for retaining a due process right to challenge the assessment, the analogy is apt.
The United States Supreme Court has not distinguished between a privilege and a right for these purposes. See, e.g., Sherbert v. Verner, 374 U.S. 398, 404 (1963) ("Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972) ("[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights."); Graham v. Richardson, 403 U.S. 365, 374 (1971) ("But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' "); Kerry v. Din, 135 S. Ct. 2128, 2143 (2015) (Breyer, J., dissenting) ("Justice SCALIA's response— *140 that nonconstitutional law creates an 'expectation' that merits procedural protection under the Due Process Clause only if there is an unequivocal statutory right,—is sorely mistaken. His argument rests on the rights/privilege distinction that this Court rejected almost five decades ago, in the seminal case of Goldberg v. Kelly, 397 U.S. 254, 262, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970).").

 See Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016) ("It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads."); Camara v. Mun. Ct., 387 U.S. 523, 540 (1967) ("We therefore conclude that appellant has a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted [of a crime] for refusing to consent to the inspection.") (emphasis added).

 See Birchfield, 136 S. Ct. at 2173 ("The States and the Federal Government have a paramount interest... in preserving [public highway] safety....") (internal quotation marks and quoted source omitted).

 Milewski v. Town of Dover, No.2015AP1523, unpublished slip op., ¶ 21 (Wis. Ct. App. May 4, 2016).

 In Hermann v. Town of Delavan, 215 Wis. 2d 370, 376, 572 N.W.2d 855, a group of taxpayers brought a claim under Wis. Stat. § 893.80 alleging that the Town's method of assessment was unfair and non-uniform. Because the taxpayers' *143 complaint did not allege their prior compliance with the property tax appeal procedures set forth in Wis. Stat. § 70.47, this court affirmed the circuit court's dismissal of the taxpayers' complaint for failing to state a claim for upon which relief could be granted; the taxpayers had failed to exhaust the exclusive statutory remedies addressing their overassessment claims, so their claims were dismissed. Hermann, 215 Wis. 2d at 377.

 The legislature has barred taxpayers from challenging tax assessments for personal property if the taxpayer failed to make full disclosure. See, e.g., Vill. of Westby v. Bekkedal, 172 Wis. 114, 121-22, 178 N.W. 451, 454 (1920) (taxpayer who did not comply with statutory requirement to attend hearing and disclose all income subject to assessment was estopped from challenging the assessment); State ex rel. Foster v. Williams, 123 Wis. 73, 75, 100 N.W. 1052, 1052 (1904) (1903 Wis. Laws ch. 284, § 2, barred the taxpayer from questioning the board's valuation unless the taxpayer made full disclosure before the board, under oath, of all his or her personal property liable to assessment in the district and the value thereof; holding that evasive answers do not constitute a full disclosure).

 Less persuasive, but worth mentioning as some support for the constitutionality of the challenged statutes, is that the challenged statutes may be considered analogous to several prerequisites a property owner must meet to contest the assessment:
*145 • Wis. Stat. § 70.47(7)(a): A person who owns land and improvements to that land may not object only to the valuation of that land or only to the valuation of improvements to that land.
• Wis. Stat. § 74.37(4)(b): No claim or action for an excessive assessment may be brought or maintained unless the tax for which the claim is filed is timely paid.
• Wis. Stat. § 74.3(4)(c): No claim or action for an excessive assessment may be brought or maintained if the assessment of the property for the same year is contested under enumerated sections of chapter 70.
• The real property owner must exhaust administrative remedies. See Northbrook Wis., LLC v. City of Niagara, 2014 WI App 22, ¶ 25, 352 Wis. 2d 657, 843 N.W.2d 851 ("That North-brook failed to avail itself of the opportunity to object before the Board of Review does not mean its right to due process was violated.").

 Lister v. Sure-Dry Basement Sys., 2008 WI App 124, 313 Wis. 2d 151, 758 N.W.2d 126 (dismissal of homeowner's action against contractor was warranted for homeowner's failure to supply physician's report); Steinberg v. Jensen, 194 Wis. 2d 439, 480, 534 N.W.2d 361 (1995) (Geske, J. concurring) *146 ("Clearly, once a patient-litigant puts his or her physical, mental, or emotional condition into issue in a lawsuit, any confidential physician-patient communications relating to that issue, including those relevant to discovery under ch. 804, Stats., are not privileged."); Khalsa v. Chose, 261 P.3d 367 (Alaska 2011) (affirming dismissal of personal injury claim for plaintiffs failure to turn over medical records despite prior warning and court order).

 Wisconsin Stat. § 905.04(4)(c) provides: "There is no privilege under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense, or ... in any proceeding in which any party relies upon the condition as an element of the party's claim or defense."